## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Jason S. Dionne, et al.

    v.                                    Civil No. 15-cv-056-LM
                                          Opinion No. 2016 DNH 093
Federal National Mortgage
Association and
JPMorgan Chase Bank, N.A.


## O R D E R

Plaintiffs originally filed this mortgage foreclosure dispute in the New Hampshire Superior Court, Hillsborough County, Southern District.  Defendants Federal National Mortgage Association ("Fannie Mae") and JPMorgan Chase Bank, N.A. ("Chase") removed the lawsuit to this court and now move to dismiss it.  Plaintiffs object.


### The Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted."  Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (citations and internal quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Analyzing
plausibility is "a context-specific task" in which the court
relies on its "judicial experience and common sense."  Id. at
679.

## Background[1]

Denise Dionne has lived at her home at 40 Tallant Road in
Pelham, New Hampshire (the "property") since 1977.  In 2005,
Denise added her son, Jason Dionne, to the property's deed.  In
2006, Denise, Jason, and Jason's wife, Kathy Dionne
(collectively, the "Dionnes"), took out a loan, which was
secured by a mortgage on the property.  The mortgage states that
Mortgage Electronic Registration Systems, Inc. ("MERS") is the
mortgagee as nominee for the lender, Domestic Bank.

MERS assigned the mortgage and note to Washington Mutual
Bank ("Mutual Bank") in 2008.  Chase obtained the mortgage and
note when it acquired Mutual Bank later in 2008.  In 2010, Chase
assigned the mortgage to Fannie Mae.  Chase also acted as the
loan servicer at all times relevant to this case.  The Dionnes
allege that they were in default on their obligations under the

---

[1] The facts are summarized from the Dionnes' amended
complaint (doc. no. 21), and the exhibits attached thereto.  See
Trans-Spec Truck Serv. v. Caterpillar, Inc., 524 F.3d 315, 321
(1st Cir. 2008).

note when Mutual Bank and Chase obtained the loan, and when Chase began servicing the loan.

In 2010, the Dionnes' loan was modified after they fell behind on their loan payments.  Sometime after the 2010 loan modification, the Dionnes again fell behind on their modified loan payment obligations.

In August 2014, Chase sent the Dionnes[2] a letter informing them that "the foreclosure sale date has been rescheduled" for October 1, 2014.[3]  Doc. no. 21-2 at 1.  Chase did not serve or deliver the letter via registered or certified mail.  The letter did not inform the Dionnes of their right to petition the New Hampshire Superior Court to enjoin the sale.

After receiving the letter informing them of the rescheduled foreclosure date, the Dionnes completed a loss mitigation application (which they downloaded from Chase's website) seeking a modification of their loan.  Kathy faxed the application to Chase on August 25, 2014.[4]

---

[2] The various communications from Chase are addressed to either Denise or both Denise and Jason.  For simplicity, the court will refer to the recipients of the communications as "the Dionnes."

[3] The amended complaint does not contain any allegations that the Dionnes had been notified of a foreclosure sale prior to August 2014.

[4] Denise authorized Kathy to communicate with Chase on her behalf.  Doc. no. 21 at ¶ 36.

Chase acknowledged receiving the Dionnes' application in a letter dated August 27, 2014.  See doc. no. 21-3.  The letter requested additional documents and stated that Chase would make a determination of eligibility within 30 days of receiving the additional documents.  Kathy contacted Chase and determined that the missing documents were pay stubs and a proof of benefits statement.  Soon thereafter, Kathy sent the additional documents to Chase.

On October 2, 2014, Chase sent the Dionnes a "Notice of Intent to Foreclose," which stated that Chase may accelerate the loan and commence foreclosure proceedings if they failed to cure the default.[5]  See doc. no. 21-4.  On October 3, 2014, Chase sent the Dionnes a second letter acknowledging receipt of their loss mitigation application.  See doc. no. 21-5.  Like the August 27 letter, the October 3 letter stated that the application was incomplete.  The Dionnes allege, however, that "the letter further includes a 'document status' which stated that nothing was needed from the Dionnes at that time."  Doc. no. 21 at ¶ 39.

On October 7, 2014, the Dionnes received two letters from Chase.  The first, like the October 3 letter, stated that the Dionnes' loss mitigation application was incomplete.  See doc. no. 21-6.  The Dionnes allege that the first letter again

---

[5] It is unclear as to why the foreclosure sale did not take place as scheduled on October 1, 2014.

indicated in the "document status" section that nothing was needed from them.  The letter stated that Chase needed to receive a completed application by November 6, 2014, and that it would contact the Dionnes within 30 days of receiving the missing documents.

In the second October 7, 2014 letter, Chase again stated that the loss mitigation application was incomplete.  See doc. no. 21-7.  The "document status" section of the second letter stated that pay stubs and a benefits statement or letter were received, but that both were incomplete or not legible.  Id. at 5.  The letter requested another copy of those documents.  The letter also listed the November 6, 2014 deadline, and stated that Chase would contact the Dionnes within 30 days of receiving the missing documents.

Kathy called Chase shortly after receiving the October 7 letters.  Chase informed her that she needed to provide statements showing she received "SSDI deposits" into her account and a printout for deposits and purchases made with her food stamp card.  Kathy faxed those documents to Chase on October 17, 2014.  The Dionnes allege that as of that date (October 17), their loss mitigation application was complete.

Chase, however, sent the Dionnes two additional letters stating that their loss mitigation application was incomplete. Chase sent such letters on October 18 and 21, 2014.  See doc.

nos. 21-9 and 21-10.  Both letters stated that pay stubs and a benefits statement or letter were received, but that both were incomplete or not legible.  Both letters listed the November 6, 2014 deadline, and stated that Chase would contact the Dionnes within 30 days of receiving the missing documents.  Frustrated that Chase kept claiming that the documents were illegible, Kathy faxed the documents to herself and confirmed that the faxed copies of the documents were legible.

Kathy contacted Chase regarding the supposedly illegible documents.  Chase told Kathy to send pay stubs for the August/September period, so that it could make a determination on the Dionnes' application as of the time it was originally submitted.

On November 5, 2014, the Dionnes sent Chase paper copies via overnight mail of the August/September pay stubs Chase had requested.  In a letter dated November 8, 2014, Chase again notified the Dionnes that their application was not complete. See doc. no. 21-12.  The letter stated that Chase had not received a completed application by the November 6, 2014 deadline, but that it may still be able to review the Dionnes' request for assistance if they were to send Chase the missing information immediately.  Despite stating that the request was incomplete, the "document status" section of the letter listed several required documents, and stated for each that "[t]here is

6

nothing needed from you at this time for this document."  Doc.
no. 21-12 at 4-5.

On November 18, 2014, Harmon Law Office ("Harmon") sent a
letter to the Dionnes on behalf of Chase and Fannie Mae.  Harmon
notified the Dionnes that their loan "had been accelerated and
failure to reinstate would result in foreclosure."  Doc. no. 21
at ¶ 55.  The letter further stated that "this office is
attempting to collect a debt and that any information obtained
will be used for that purpose."  Id.  The letter did not notify
the Dionnes of their right to petition the court to enjoin the
foreclosure.

On November 19, 2014, Chase sent the Dionnes another letter
stating that their loss mitigation application was incomplete.
See doc. no. 21-15.  As with the November 8 letter, the November
19 letter stated that Chase had not received a completed
application by the November 6, 2014 deadline, but that it may
still be able to review the Dionnes' request for assistance if
they were to send Chase the missing information immediately.
Unlike the November 8 letter, however, the "document status"
section of the November 19 letter listed the pay stubs as
incomplete or not legible, and requested that the Dionnes send
Chase another copy.  See id. at 8.

In a letter dated November 23, 2014, Chase notified the
Dionnes that a foreclosure sale had been rescheduled for January

12, 2015.  See doc. no. 21-17.  Chase did not serve or deliver the letter via registered or certified mail.  The letter did not inform the Dionnes of their right to petition the court to enjoin the foreclosure sale.[6]

On December 11, 2014, Harmon delivered a foreclosure notice to the Dionnes on behalf of Chase and Fannie Mae.  See doc. no. 21-18.  The notice informed the Dionnes that a foreclosure sale was scheduled for January 12, 2015, at 1:00 p.m., and that they had the right to petition the court to enjoin the foreclosure sale.  This notice was the first time the Dionnes were notified of their right to petition the court to enjoin the foreclosure sale.

On January 7, 2015, Kathy called Chase and spoke with Kathy Goulden ("Goulden"), a Chase representative.  Goulden told Kathy that Chase had not made a decision on the loss mitigation application, that she could not "confirm all options to avoid foreclosure had been exhausted," and that she would request that the foreclosure sale be stopped.  Doc. no. 21 at ¶ 66.  Goulden also asked Kathy to send her copies of the August/September pay

---

[6] The amended complaint alleges that Chase sent two letters, dated November 23 and November 24, 2014, rescheduling the foreclosure sale and states that both are attached to the amended complaint as exhibit 17.  However, the Dionnes attached to the amended complaint only an incomplete copy of the November 23 letter, and did not attach a copy of the November 24 letter.  See doc. no. 21-17.

stubs, the same documents Kathy had sent to Chase via overnight mail on November 5, 2014.

On January 9, 2015, Kathy spoke with a Chase representative, who informed her that the August/September pay stubs, as well other documents included with the Dionnes' loss mitigation application, were "stale" because they were over 90 days old.  That same day, Kathy faxed another completed loss mitigation application to Chase.  See doc. no. 21-19.

On January 10, 2015, Kathy spoke with a Chase representative who informed her that the Dionnes' loss mitigation application was complete.  The Dionnes also received a letter from Chase dated that same day, which stated that Chase had not received a completed application by the November 6, 2014 deadline, but that it may still be able to review the Dionnes' request for assistance if they were to send Chase the missing information immediately.  See doc. no. 21-20.  Despite stating that the request was incomplete, the "document status" section of the letter listed several required documents, and stated for each that "[t]here is nothing needed from you at this time for this document."  Id. at 4-5.

The Dionnes do not allege that they heard anything further from Chase about Goulden's statement that she would make a request to stop the foreclosure.  In a letter from Chase dated June 10, 2015 (doc. no. 21-20 at 1) Chase wrote in bold letters:

> Your request for mortgage assistance doesn't stop the
> foreclosure process or sale.  Do not ignore any
> notices.

Despite being aware that "they could submit a petition on their own with the court to stop the foreclosure because Chase had not provided them with an answer on the loss mitigation application," (doc. no. 21 at ¶ 73), the Dionnes did not file a petition to enjoin the foreclosure sale scheduled for January 12, 2015.  On January 12, an auctioneer appeared at the property to conduct the foreclosure sale.  Kathy called Chase, Fannie Mae, and Harmon, but each told Kathy that they could not stop the foreclosure sale.  The foreclosure sale took place as scheduled, and Fannie Mae purchased the property at the sale.

## Discussion

Denise and Jason Dionne filed this action in state court seeking an order voiding the foreclosure.  Defendants removed the action to this court and filed a motion to dismiss (doc. no. 5).  In an order dated June 16, 2015, the court denied defendants' motion.  The Dionnes then amended their complaint (doc. no. 21), adding Kathy as a plaintiff and asserting eight counts against defendants: three against both Chase and Fannie Mae (Counts II, IV, and VII); three against only Chase (Counts I, III, and V); and two against only Fannie Mae (Counts VI and VIII).  Defendants move to dismiss the amended complaint in its

entirety (doc. no. 23).  The Dionnes object (doc. no. 24).  The
court addresses each count separately below.

I.    Count I: Real Estate Settlement Procedures Act

In Count I of their amended complaint, the Dionnes allege
that Chase violated Regulation X of the Real Estate Settlement
and Procedures Act ("RESPA"), 12 C.F.R. § 1024.41, by (1)
conducting a foreclosure sale prior to acting on their complete
loss mitigation application and (2) failing to act with
reasonable diligence by repeatedly asking them for documents
that they had already submitted to Chase.[7]

A.    Conducting the Foreclosure

In relevant part, RESPA provides that

> [i]f a servicer receives a complete loss mitigation
> application more than 37 days before a foreclosure
> sale, then, within 30 days of receiving a borrower's
> complete loss mitigation application, a servicer
> shall: (i) [e]valuate the borrower for all loss
> mitigation options available to the borrower; and (ii)
> [p]rovide the borrower with a notice in writing
> stating the servicer's determination . . . .

12 C.F.R. § 1024.41(c).  RESPA further provides that "[i]f a
borrower submits a complete loss mitigation application after a
servicer has made the first notice or filing required by

―――――――――――――――

[7] The amended complaint alleges five separate violations of
RESPA, which fall into the two categories of conduct listed
above.

applicable law for any . . . foreclosure process but more than

37 days before a foreclosure sale, a servicer shall not . . .

conduct a foreclosure sale . . . ."  Id. § 1024.41(g).

Defendants advance two arguments in support of dismissing

the Dionnes' RESPA claim based on the foreclosure sale.  First,

they argue that the Dionnes did not submit a complete loss

mitigation application more than 37 days before the foreclosure

sale.  This argument is unavailing.

RESPA provides that "[a] complete loss mitigation

application means an application in connection with which a

servicer has received all the information that the servicer

requires from a borrower in evaluating applications for the loss

mitigation options available to the borrower."  § 1024.41(b)(1).

The Dionnes allege that they provided all of the information

that Chase requested, often providing documents multiple times

as Chase could not locate items they had previously submitted.

The Dionnes also allege that the application was complete on or

before October 17, 2014, more than the required 37 days before

the scheduled foreclosure.  Doc. no. 21 at ¶ 44.  These

allegations are sufficient to support a claim that the Dionnes

submitted a complete loss mitigation application more than 37

days prior to the foreclosure sale.

Defendants' second argument is that the timing of events

precludes relief as to a RESPA claim based on the foreclosure

sale.  They assert that the notices of foreclosure the Dionnes
received in August and December of 2014 were not the "first"
such notices.  In support, defendants attach as an exhibit to
their motion to dismiss a notice of foreclosure from Harmon to
Denise dated May 2, 2012.  See doc. no. 23-6.  Defendants argue
that this notice precludes any relief under RESPA for a claim
arising out of the foreclosure sale.

Even if the court could consider the May 2, 2012 notice for
purposes of the motion to dismiss, that notice is not
dispositive of the Dionnes' RESPA claim based on the
foreclosure.  The Dionnes pled violations of 12 C.F.R. §
1024.41(f)(2) and § 1024.41(g) in the alternative.  Section
1024.41(f)(2) prohibits a loan servicer from foreclosing under
certain circumstances if the borrower submits a complete loss
mitigation application before the servicer has made "the first
notice or filing required by applicable law" for a non-judicial
foreclosure.  Section 1024.41(g) prohibits a servicer from
foreclosing under certain circumstances if a borrower has
submitted a complete loss mitigation application after "the
servicer has made the first notice of filing required by law."
Thus, even if defendants had shown that the 2012 notice was the
first foreclosure notice, which would preclude relief under

§ 1024.41(f)(2), that would not be dispositive of the Dionnes'
claim based on defendants' alleged violation of § 1024.41(g).[8]

The amended complaint plausibly alleges that the Dionnes
timely submitted a complete loss mitigation application, and
that Chase violated RESPA by conducting a foreclosure sale prior
to acting on the application.  Therefore, defendants are not
entitled to dismissal of the Dionnes' RESPA claim based on the
foreclosure.

    B.  Reasonable Diligence

Although defendants urge dismissal of Count I in its
entirety, they do not address the Dionnes' RESPA claim based on
Chase's failure to exercise reasonable diligence.  RESPA
provides that a "servicer shall exercise reasonable diligence in
obtaining documents and information to complete a loss
mitigation application."  12 C.F.R. § 1024.41(b)(1).  The
Dionnes allege that Chase violated this regulation by repeatedly
requesting documents they had already submitted multiple times,
and by requesting documents even when it had previously told the

---

[8] To the extent defendants intended to argue that the 2012
notice is also dispositive of the Dionnes' claim based on
§ 1024.41(g), that argument is not sufficiently developed.
Defendants cite no legal authority to support the contention
that if a lender issues a second foreclosure notice prior to
receiving a loss mitigation application, a borrower is precluded
from asserting his rights under § 1024.41(g).

Dionnes that it did not need anything further from them.
Further, Chase claimed certain faxed documents were illegible,
but the Dionnes verified that faxed copies of those documents
were legible.  These allegations set forth a plausible claim
that Chase did not exercise reasonable diligence in obtaining
documents and information to complete the Dionnes' loss
mitigation application.

Accordingly, defendants' motion to dismiss is denied as to
Count I.

II.  Count II: Equal Credit Opportunity Act ("ECOA")

In Count II, the Dionnes allege two violations of the ECOA,
15 U.S.C. § 1691.  They allege that Chase and Fannie Mae failed
to notify the Dionnes of action on their loss mitigation
application within thirty days of receiving the application in
violation of § 1691(d)(1).  They also allege that Chase and
Fannie Mae failed to provide written notification denying their
loss mitigation application as required by § 1691(d)(2).
Defendants move to dismiss the ECOA claim arguing first that the
Dionnes failed to allege an "adverse action" as required to
state a claim under § 1691(d), and second, that the Dionnes
cannot state an ECOA claim because defendants satisfied their
ECOA obligations by notifying the Dionnes that their application
was incomplete.

A.   <u>Section 1691(d)(1)</u>

Defendants first contend that the conduct complained of in the amended complaint, denying the Dionnes' loss mitigation application after they were in default of their loan, is not an "adverse action" under § 1691(d)(1). The court agrees that this conduct does not meet the definition of an "adverse action." The ECOA specifically excludes from the definition of an adverse action the "refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit." § 1691(d)(6).

The lack of an adverse action, however, does not entitle defendants to dismissal of the Dionnes' § 1691(d)(1) claim. Section 1691(d)(1) provides as follows:

> (d) Reason for adverse action; procedure applicable; "adverse action" defined
>
> (1) Within thirty days (or such longer reasonable time as specified in regulations of the Bureau for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

15 U.S.C. § 1691(d)(1). The plain language of § 1691(d)(1) does not require an adverse action; rather, it requires a creditor to notify the applicant within 30 days of "its action" on "a

16

completed application for credit . . . ."[9]  "Under Section 1691,
an 'adverse action' triggers a creditor's obligation to provide
a statement of reasons [under § 1691(d)(2)], not its obligation
to provide a determination within thirty days [under §
1691(d)(1)], which is triggered by the completion of the
application for credit." Green v. Cent. Mortg. Co., No. 3:14-
CV-04281-LB, 2015 WL 7734213, at *17 (N.D. Cal. Dec. 1, 2015)
(quoting MacDonald v. Wells Fargo Bank, N.A., No. 14-cv-04970-
HSG, 2015 WL 1886000, at *3 (N.D. Cal. Apr. 24, 2015)).

Here, the Dionnes allege that Chase failed to notify them
of action taken on their completed loss mitigation application
within 30 days of Chase's receipt of it.  These allegations are
sufficient to survive defendants' motion to dismiss the §
1691(d)(1) claim.

Defendants next argue that even if the ECOA required them
to "take action" on the Dionnes' application within 30 days,
they complied with that deadline by notifying the Dionnes that
their application was incomplete.  This argument misses the
mark.  The notification required under § 1691(d)(1) concerns
notice of action taken on a completed application.

---

[9] In addition to taking "adverse action" on a completed
application, a creditor could also approve or offer a
counteroffer to the application.  See 12 C.F.R. §
202.9(a)(1)(i).

The Dionnes concede that Chase notified them that their application was incomplete at various times in August and October 2014.  They allege, however, that they supplied the requested information and that on October 17, 2014, their loss mitigation application was complete.  Doc. no. 21 at ¶ 44.  They also allege that as of January 12, 2015, when defendants foreclosed on their home, defendants had not notified them of any action defendants had taken on their completed loss mitigation application.  Id. at ¶¶ 63, 76-77.  These facts are sufficient to state a claim that defendants violated § 1691(d)(1).[10]

B.   Section 1691(d)(2)

Section 1691(d)(2) provides:

(d) Reason for adverse action; procedure applicable; "adverse action" defined

. . . .

---

[10] The regulations implementing § 1691(d) contain a separate section entitled "Incomplete Applications" that deals with notice regarding incomplete applications.  See 12 C.F.R. § 202.9(c).  That regulation further supports the viability of the Dionnes' § 1691(d)(1) claim.  It states that "[i]f the applicant supplies the requested information within the designated time period," the creditor "shall take action on the application" and provide notice of such action within 30 days.  12 C.F.R. § 202.9(c)(2).

> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor . . . .

§ 1691(d)(2).

As discussed above, the ECOA specifically excludes from the definition of an "adverse action" the refusal to grant a loss mitigation application to a borrower who, like the Dionnes, is in default.  See § 1691(d)(6).  Because denying a loss mitigation application to a borrower who is in default is not an "adverse action" under the ECOA, the Dionnes cannot assert a claim under § 1691(d)(2).

Accordingly, defendants' motion is granted to the extent it seeks dismissal of the Dionnes' ECOA claim based on a violation of § 1691(d)(2).  The motion is denied to the extent it seeks dismissal of the claim based on § 1691(d)(1).

III. Count III: Fair Debt Collection Practices Act ("FDCPA")

In Count III, the Dionnes allege that Chase violated the FDCPA, 15 U.S.C. §§ 1692 et. seq., by threatening to foreclose, and then foreclosing, on the property when Chase did not have a right to possess the property.  See 15 U.S.C. § 1692f(6)(A).  To state a claim under the FDCPA, plaintiffs must allege that:

> (1) they have been the object of collection activity arising from a consumer debt; (2) the defendant attempting to collect the debt qualifies as a "debt collector" under the Act; and (3) the defendant has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA.

LaCourse v. Ocwen Loan Servicing, LLC, No. 14-cv-013-LM, 2015 WL
1565250, at *9 (D.N.H. Apr. 7, 2015) (citing Moore v. Mortg.
Elec. Registration Sys., Inc., 848 F. Supp. 2d 107, 113 (D.N.H.
2012)).  Defendants move to dismiss the Dionnes' FDCPA claim,
arguing that the Dionnes have failed to allege facts that
satisfy any of the three elements of an FDCPA claim.

    A.    Collection Activity

    Defendants argue that the Dionnes have not sufficiently
alleged the first element because Chase was not engaged in
collection activity, but was instead prosecuting a foreclosure
against the Dionnes.  Defendants correctly note that the
majority of courts that have addressed the issue have held that
foreclosing on a mortgage is not debt collection activity for
purposes of the FDCPA.  See, e.g., Beadle v. Haughey, No. Civ.
04-272-SM, 2005 WL 300060, at *3 (D.N.H. Feb. 9, 2005).
However, "the case law is not uniform on this point."  Moore,
848 F. Supp. 2d at 125 n.11 (collecting cases).

    In addition, the Dionnes' FDCPA claim is based on
§ 1692f(6)(A), which prohibits "[t]aking or threatening to take
any nonjudicial action to effect dispossession or disablement of
property if there is no present right to possession of the
property . . . ."  Courts uniformly recognize that even if
foreclosing on a mortgage is not debt collection activity as a

general matter for purposes of the FDCPA, it is debt collection activity for purposes of § 1692f(6).  See Beadle, 2005 WL 300060, at *3 (noting that "foreclosure has been held to be debt collection" in certain circumstances, such as in claims brought pursuant to § 1692f(6)); see also Brown v. SunTrust Bank, No. 2:14-CV-0014-RWS-JSA, 2014 WL 4925719, at *16 (N.D. Ga. Sept. 30, 2014) ("[T]he actions taken by STB in this case in foreclosing on the Property would generally not be considered 'debt collection activity' under the FDCPA, except for a claim brought under § 1692f(6)."); Jara v. Aurora Loan Servs., LLC, No. C 11-00419 LB, 2011 WL 6217308, at *5 (N.D. Cal. Dec. 14, 2011) ("[W]hile a non-judicial foreclosure action generally does not constitute a 'debt collection activity' under the FDCPA, an exception to this rule exist[s] for claims under 15 U.S.C. § 1692f(6).") (internal quotation marks and citation omitted). Therefore, the amended complaint adequately alleges that Chase was engaged in debt collection activity for purposes of § 1692f(6).

B.   Debt Collector

Defendants argue that Chase is not a "debt collector" under the FDCPA because the Dionnes were not in default on their loan when Chase was assigned the loan or took over as the loan servicer.  See, e.g., Crepeau v. JP Morgan Chase Bank, N.A., No.

11-cv-125-JL, 2011 WL 6937508, at *5 (D.N.H. Dec. 5, 2011)

("term 'debt collector' does not include consumer's creditors, a

mortgage servicing company, or an assignee of a debt, as long as

the debt was not in default at the time it was assigned")

(internal quotation marks and citation omitted).  The Dionnes'

amended complaint, however, alleges that their "loan was in

default at the time . . . Chase obtained the loan, and/or when

Chase took on the servicing of the [] loan."  Doc. no. 21 at ¶

12.  These allegations are sufficient at this stage to allege

that Chase was a debt collector under the FDCPA.

> C.   Prohibited Act

Finally, defendants argue that the Dionnes have failed to

allege that Chase engaged in a prohibited act under the FDCPA.

The FDCPA prohibits a debt collector from "[t]aking or

threatening to take any nonjudicial action to effect

dispossession or disablement of property if there is no present

right to possession of the property claimed as collateral

through an enforceable security interest."  15 U.S.C. § 1692f

(6)(A).  As explained above, the Dionnes have stated a plausible

claim that RESPA prohibited Chase from foreclosing on the

property before notifying them of action taken on their loss

mitigation application.  At this stage of the litigation, this

allegation is sufficient to satisfy the "prohibited act" element

of the FDCPA.[11]  As such, the Dionnes have alleged a viable claim against Chase for violating § 1692f(6).

Accordingly, defendants' motion to dismiss is denied as to Count III.


IV.  Count IV: Unfair Deceptive, or Unreasonable Collection Practices Act ("UDUCPA")

In Count IV, the Dionnes allege that Chase and Fannie Mae violated New Hampshire's UDUCPA, N.H. Rev. Stat. Ann. ("RSA") § 358-C, by threatening to foreclose on the property when they did not have a right to possess the property.

The UDUCPA "is the 'state-law analog' to the federal FDCPA." LaCourse, 2015 WL 1565250, at *12 (internal quotation marks and citation omitted).  Similar to a claim under the FDCPA, in order to recover under the UDUCPA, a plaintiff must show that 1) the plaintiff has "been the object of collection activity arising from a consumer debt"; 2) the defendant is a debt collector as defined by the UDUCPA; and 3) "the defendant has engaged in a prohibited act or has failed to perform a

---

[11] Defendants do not address whether the RESPA violations the Dionnes allege are sufficient to deprive them of a "right to possession of the property" under § 1692f(6)(A).  The court assumes without deciding that the alleged RESPA violations are sufficient to show that defendants had no right to possess the property.  To the extent defendants contend otherwise, they may raise that argument in a properly supported motion for summary judgment.

requirement imposed by the" UDUCPA.  Pruden v. CitiMortgage, Inc., No. 12-cv-452-LM, 2014 WL 2142155, at *8 (D.N.H. May 23, 2014) (internal quotation marks and citations omitted).  "Given the dearth of case law on the UDUCPA, FDCPA cases are useful in interpreting the UDUCPA because the FDCPA contains provisions similar to the UDUCPA." LaCourse, 2015 WL 1565250, at *12 (internal citations, quotation marks, and alteration omitted). Defendants argue that the amended complaint fails to allege a plausible UDUCPA claim against them because the Dionnes do not sufficiently allege that defendants are debt collectors or that they engaged in a prohibited act.

With respect to the "debt collector" element, the Dionnes base their claim on actions taken by Harmon as agent for Fannie Mae and Chase.  Relying on case law interpreting the FDCPA, defendants argue that the UDUCPA does not allow for vicarious liability of a principal for actions of an agent.  However,

> [w]hen courts have ruled that creditors are not
> vicariously liable under the FDCPA for the conduct of
> their debt collectors, they typically base those
> rulings on an understanding that the FDCPA limits
> liability to debt collectors.  But, the FDCPA and the
> UDUCPA define the term "debt collector" differently,
> and the UDUCPA definition is substantially broader.

Doucette v. GE Capital Retail Bank, No. 14-cv-012-LM, 2014 WL 4562758, at *3 (D.N.H. Sept. 15, 2014) (internal citations omitted).  Under the UDUCPA, a debt collector is "[a]ny person who by any direct or indirect action, conduct or practice

enforces or attempts to enforce an obligation that is owed or due, or alleged to be owed or due, by a consumer as a result of a consumer credit transaction."  RSA 358–C:1, VIII(a) (emphasis added).  "As a result, a creditor that is not a debt collector for purposes of the FDCPA could qualify as a debt collector under the UDUCPA . . . ."  Doucette, 2014 WL 4562758, at *3.  Thus, even if Fannie Mae and Chase are not themselves debt collectors under the FDCPA, they may be vicariously liable for Harmon's actions on their behalf under the UDUCPA.

Defendants next argue that the Dionnes have not alleged that defendants engaged in a prohibited act under the UDUCPA.  The Dionnes' UDUCPA claim is based on RSA 358–C:3, III, which prohibits a debt collector from "[t]hreaten[ing] to take any unlawful action or action which the debt collector in the regular course of business does not take."  The Dionnes allege that Harmon threatened to bring a foreclosure action on behalf of Fannie Mae and Chase for failure to pay an amount due, despite Fannie Mae's and Chase's lack of authority to foreclose.[12]  See doc. nos. 21–14 and 21–18.  Construing all

---

[12] As discussed above, the Dionnes have alleged sufficient facts to state a plausible claim that RESPA prohibited Chase and Fannie Mae from foreclosing on their property.  See supra Part I.  Although the Dionnes bring their RESPA claim against only Chase, they allege that Chase acted as an agent of Fannie Mae.  Doc. no. 21 at ¶ 6.  Therefore, the Dionnes have alleged that Fannie Mae did not have a lawful right to foreclose on the property for purposes of the UDUCPA.

reasonable inferences in the Dionnes' favor, defendants
threatened to foreclose on the property despite not having a
lawful right to do so.  These allegations are sufficient to
satisfy the third element of the UDUCPA.  Therefore, the Dionnes
have plausibly alleged a claim against Chase and Fannie Mae
under the UDUCPA.

Accordingly, defendants' motion to dismiss is denied as to
Count IV.

## V.   Count V: Consumer Protection Act

In Count V, the Dionnes allege that Fannie Mae violated the
New Hampshire Consumer Protection Act ("CPA"), RSA 358-A, by
engaging in unfair conduct during the course of the Dionnes'
efforts to complete their loss mitigation application and in
Fannie Mae's efforts to foreclose on the property.  Defendants
argue that they are entitled to dismissal of the Dionnes' CPA
claim because Fannie Mae is exempt from liability under the CPA.

Section 358-A:3, I provides that "[t]rade or commerce that
is subject to the jurisdiction of . . . federal banking or
securities regulators who possess the authority to regulate
unfair or deceptive trade practices" is exempt from the
provisions of the CPA.  "[F]or regulation to fall within the
purview of RSA 358-A:3, I, it ha[s] to be comprehensive and
ha[s] to protect consumers from the same fraud and unfair

26

practices as the CPA."  Rainville v. Lakes Region Water Co., 163 N.H. 271, 276 (2012) (citing Averill v. Cox, 145 N.H. 328, 332-33 (2000)).  "The burden of proving exemptions from the provisions of [the CPA] by reason of paragraph[ ] I . . . of this section shall be upon the person claiming the exemption." RSA 358-A:3, V.

Defendants argue that Fannie Mae is subject to the jurisdiction of the Federal Housing Finance Agency ("FHFA"), and that the regulations codified under 12 C.F.R. §§ 1200-1299, grant the FHFA the authority to regulate unfair or deceptive trade practices.  The Dionnes agree that Fannie Mae is regulated by the FHFA, but they contend that the FHFA does not have the authority to regulate the type of conduct subject to the CPA.

12 C.F.R. 1200.1(a), titled "Scope and authority," describes the FHFA as follows:

> FHFA is responsible for the supervision and regulation of the Federal National Mortgage Corporation (Fannie Mae). . . . FHFA is charged with ensuring that the regulated entities: Operate in a safe and sound manner, including maintaining adequate capital and internal controls; foster liquid, efficient, competitive, and resilient national housing finance markets; comply with the Safety and Soundness Act and their respective authorizing statutes, and rules, regulations and orders issued under the Safety and Soundness Act and the authorizing statutes; and carry out their respective statutory missions through activities and operations that are authorized and consistent with the Safety and Soundness Act, their respective authorizing statutes, and the public interest.

Other than a reference to carrying out its oversight authority
in "the public interest," this regulation does not contain any
reference to the FHFA's authority to protect consumers from its
regulated entities' deceptive or unfair practices.  Further, the
regulations as a whole, see 12 C.F.R. §§ 1200-1299, contain no
grant of power "to protect consumers from the same fraud and
unfair practices as the CPA."  Rainville, 163 N.H. at 276.

Defendants point to 12 C.F.R. § 1233.1 as an example of a
regulation that grants the FHFA the authority to regulate Fannie
Mae for unfair or deceptive practices.  That regulation requires

> each regulated entity to report to FHFA upon discovery
> that it has purchased or sold a fraudulent loan or
> financial instrument, or suspects a possible fraud
> relating to the purchase or sale of any loan or
> financial instrument.  In addition, each regulated
> entity must establish and maintain internal controls,
> policies, procedures, and operational training to
> discover such transactions.

Id.  As the Dionnes correctly point out, this regulation
authorizes the FHFA to monitor fraudulent transactions entered
into by Fannie Mae.  It does not authorize the FHFA to protect
consumers from deception, fraud, and unfair trade practices
committed by Fannie Mae.  Defendants cite no case law supporting
their argument that the FHFA's regulatory authority exempts them
from the Dionnes' CPA claim, and the court has been unable to
locate any.  Defendants have failed to carry their burden to

show that the exemption set forth in RSA 358-A:3, I, applies to
this case.

Accordingly, defendants' motion to dismiss Count V is denied.

VI.  Count VI: Breach of the Implied Covenant of Good Faith and
     Fair Dealing

In Count VI, the Dionnes allege that Fannie Mae violated
the implied covenant of good faith and fair dealing in the
mortgage agreement because of its mishandling of and failure to
consider their loss mitigation application and the foreclosure
sale that followed.  Defendants move to dismiss the Dionnes'
claim, arguing that failure to consider a loss mitigation
application before foreclosing on a property does not violate
the covenant of good faith and fair dealing in the mortgage
agreement.

In New Hampshire, every agreement includes "an implied
covenant that the parties will act in good faith and fairly with
one another." Birch Broad., Inc. v. Capitol Broad. Corp., 161
N.H. 192, 198 (2010) (citing Livingston v. 18 Mile Point Drive,
Ltd., 158 N.H. 619, 624 (2009)).  The New Hampshire Supreme
Court has observed that:

> [T]here is not merely one rule of implied good-faith
> duty, but a series of doctrines, each of which serves
> a different function.  The various implied good-faith
> obligations fall into three general categories: (1)
> contract formation; (2) termination of at-will
> employment agreements; and (3) limitation of
> discretion in contractual performance.

Id. (citations omitted).  Like many similarly situated plaintiffs, the Dionnes understand their claim to fall within the third category of cases described in Birch, which involves limits on the discretion a party may exercise when performing its contractual obligations.  See Rouleau v. U.S. Bank, N.A., No. 14-cv-568-JL, 2015 WL 1757104, at *3 (D.N.H. Apr. 17, 2015); see also Moore, 848 F. Supp. 2d at 127.  The function of that category "is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations as well as 'with common standards of decency, fairness and reasonable- ness.'" Birch, 161 N.H. at 198 (quoting Livingston, 158 N.H. at 624).

Here, the mortgage expressly provides that, in the event the Dionnes default on the mortgage, the lender may exercise the statutory power of sale.  Doc. no. 21-1 at ¶ 22.  Thus, Fannie Mae's exercise of that right is consistent with the parties' "agreed-upon common purpose and justified expectations . . . ." Birch, 161 N.H. at 198.  As such, Fannie Mae's foreclosure in accordance with the terms of the mortgage cannot serve as the basis for a claim for breach of the implied covenant of good faith and fair dealing.  See Rouleau, 2015 WL 1757104, at *5; see also Moore, 848 F. Supp. 2d at 129.

In addition, to the extent the Dionnes base their claim on Fannie Mae's failure, through Chase, to properly consider or handle the Dionnes' loss mitigation application, that claim is without merit.  "[T]he covenant of good faith and fair dealing in a loan agreement cannot be used to require the lender to modify or restructure the loan." Moore, 848 F. Supp. 2d at 130; see also Douglas v. U.S. Bank Nat'l Assoc., No. 13-cv-101-LM, 2013 WL 1890728, at *5 (D.N.H. May 6, 2013) (implied covenant of good faith and fair dealing does not require lender to consider or grant a loan modification application).

Accordingly, Count VI is dismissed.

VII. Count VII: "Fraud-Misrepresentation"

In Count VII, the Dionnes allege that Chase and Fannie Mae made fraudulent statements when (1) they repeatedly informed the Dionnes that their loss mitigation application was incomplete; and (2) Goulden told Kathy that she would request that the foreclosure sale be canceled.  Defendants move to dismiss Count VII arguing, among other things, that the Dionnes' fraud claim is barred by the economic loss doctrine.

"The economic loss doctrine is a judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract

relationship." Wyle v. Lees, 162 N.H. 406, 410 (2011) (internal quotation marks and citation omitted).  "[T]he rule precludes a harmed contracting party from recovering in tort unless he is owed an independent duty of care outside the terms of the contract."  Id.  In other words, "representations made during the course of the contract's performance and related to the subject matter of the contract . . . are so bound up in 'the performance of the contract' as to be barred by the economic loss doctrine." Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 109 (1st Cir. 2013).

> Where the existence of such an additional duty is claimed, "[t]he burden is on the borrower seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender."

Schaefer v. IndyMac Mortg. Servs., No. 12-cv-159-JD, 2012 WL 4929094, at *3 (D.N.H. Oct. 16, 2012) (quoting Seymour v. N.H. Sav. Bank, 131 N.H. 753, 759 (1989)) aff'd, 731 F.3d 98 (1st Cir. 2013).

In Schaefer, the plaintiff alleged that OneWest Bank was liable to him for negligent and intentional misrepresentation because it provided him with conflicting information about which fax number to use to send OneWest information required to complete a loan modification application.  The court held that the economic loss doctrine barred the plaintiff's claims because he

> [f]ail[ed] to allege facts suggesting OneWest's
> "voluntary assumption of activities beyond those
> traditionally associated with the normal role of a
> money lender." Seymour, 131 N.H. at 759 . . . .
> Representations made in a letter concerning Schaefer's
> application for a loan modification "relate entirely
> to the defendants' attempts to collect Schaefer's
> mortgage debt . . . which falls squarely within the
> normal role of a lender."

Schaefer, 2012 WL 4929094, at *4 (alterations omitted) (citing

Moore, 848 F. Supp. 2d at 133; L'Esperance v. HSBC Consumer

Lending, Inc., No. 11-cv-555-LM, 2012 WL 2122164, at *15–16

(D.N.H. June 12, 2012)).

Like the plaintiff in Schaefer, the Dionnes allege that

defendants made misrepresentations in connection with the

Dionnes' efforts to obtain a loan modification and prevent a

foreclosure sale.  The first alleged group of misrepresentations

(i.e., defendants' repeated statements that the Dionnes' loss

mitigation application was incomplete) are related to

defendants' attempts to collect the Dionnes' mortgage debt.  See

Schaefer, 2012 WL 4929094, at *4.  Therefore, the economic loss

doctrine bars the Dionnes' fraud claim based on those alleged

misrepresentations.

The remaining alleged misrepresentation (i.e., Goulden's

statement that she would request that the foreclosure sale be

canceled) "concern[s] the process by which the lenders would

decide whether to exercise their contractual right to foreclose

on the mortgage," and, like the complaint in Schaefer, the

amended complaint here "alleges that the lenders misrepresented the circumstances under which they would agree to forego that contractual right." Schaefer, 731 F.3d at 109.  Such a claim focuses on the performance of the contract and is therefore barred by the economic loss doctrine.

Accordingly, Count VII is dismissed.

VIII. Count VIII:  Violation of RSA 479:25

In Count VIII, the Dionnes allege that Fannie Mae (through Chase and Harmon) failed to comply with RSA 479:25 when it sent them foreclosure notices on August 12, 2014, November 23, 2014, November 24, 2014, and December 11, 2014.[13]  The Dionnes allege that none of the notices was served on them or sent by registered or certified mail.  They additionally allege that, except for the December 11 notice, the notices failed to advise them of their right to petition the court to enjoin the foreclosure sale as required by RSA 479:25, II.  Defendants argue that Count VIII should be dismissed because the claim is untimely, as the Dionnes failed to file a petition to enjoin the foreclosure prior to the foreclosure sale, and because the

---

[13] As discussed above, although the amended complaint references notices of foreclosure on both November 23 and November 24, 2014, it attaches as an exhibit only the November 23 notice.

Dionnes did not suffer any damages as a result of Fannie Mae's failure to comply with RSA 479:25.

Under RSA 479:25, a mortgagor seeking to challenge the validity of a planned foreclosure sale must initiate legal proceedings before the foreclosure sale occurs.  The statute provides: "Failure to institute [a petition to enjoin the foreclosure] . . . prior to sale shall thereafter bar any action or right of action of the mortgagor based on the validity of the foreclosure."  RSA 479:25, II(c); see also Nardone v. Deutsche Bank Nat'l Trust Co., No. 13-cv-390-SM, 2014 WL 1343280, at *4 (D.N.H. Apr. 4, 2014).  This provision bars actions "based on facts which the mortgagor knew or should have known soon enough to reasonably permit the filing of a petition prior to the sale."  Murphy v. Fin. Dev. Corp., 126 N.H. 536, 540 (1985).

Here, the Dionnes allegedly received several notices which did not comply with RSA 479:25, beginning in August 2014.  The Dionnes also allege that they knew they could file an action to enjoin the foreclosure sale.  See doc. no. 21 at ¶ 73.  Although they concede that they failed to do so, they argue that their failure is excused by Chase's conduct and communications preceding the sale that led them to believe that the sale would not take place.  Specifically, the Dionnes allege that they believed that Fannie Mae would cancel the foreclosure sale based on a statement by a Chase representative (Goulden) to Kathy five

days before the foreclosure that she "would request the foreclosure sale be stopped."  They also allege that during the days immediately preceding the scheduled foreclosure, Chase once again solicited a loss mitigation application and, on the eve of the scheduled foreclosure, communicated to them that the application was complete.  The Dionnes assert that, based on Chase's conduct, they reasonably believed that the foreclosure sale would not occur on January 12.

To defeat the motion to dismiss, the Dionnes rely on the court's previous order denying defendants' motion to dismiss the Dionnes' original complaint.  See doc. no. 16.  In so doing, the Dionnes ignore three significant differences between the original complaint and the amended complaint.

First, in the original complaint, the Dionnes alleged that Chase repeatedly told them that there would be no foreclosure while a loss mitigation application was pending.  Construed favorably, this allegation was sufficient to support a claim that Chase misled the Dionnes into believing the foreclosure would not occur.  The Dionnes removed this allegation from the amended complaint.  The amended complaint alleges merely that a Chase employee told them she would request that the foreclosure sale be stopped.  That new allegation, even construed favorably to the plaintiffs, is materially different than the allegation of affirmative misstatements by Chase in the original complaint.

36

Second, the Dionnes attached as an exhibit to the amended complaint a January 10, 2015 letter from Chase in which Chase wrote in bold letters: "Your request for mortgage assistance doesn't stop the foreclosure process or sale.  Do not ignore any notices."  Doc. no. 21-20 at 1.  The Dionnes did not attach this document to the original complaint.

Third, the amended complaint contains the following statement (which was not in the original complaint) about the Dionne's pre-foreclosure awareness of their right to file a petition to enjoin: "[T]he Dionnes believed that they could submit a petition on their own with the Court to stop the sale because Chase had not provided them with an answer on the loss mitigation application."  Doc. no. 21 at ¶ 73.  Therefore, the amended complaint asserts that the Dionnes knew they could, but chose not to, bring a petition to enjoin the foreclosure prior to the sale.

Unlike the allegations in the original complaint, the amended complaint does not allege facts sufficient to excuse the Dionnes' pre-foreclosure failure to comply with their duty under RSA 479:25(II)(c) to file a petition to enjoin.  Goulden's statement to the Dionnes that she would "request" a cancellation is insufficient to negate the Dionne's statutory duty to file a timely petition — particularly in light of the following factual assertions in the amended complaint: (a) that Chase separately

37

urged the Dionnes in writing not to construe their pending loss mitigation application as stopping the foreclosure, doc. no. 21-20 at 1; and (b) the Dionnes understood pre-foreclosure that they could file a petition to enjoin the foreclosure "because Chase had not provided them with an answer on the loss mitigation application," doc. no. 21 at ¶ 73.

In sum, the amended complaint, construed favorably to the Dionnes, does not plausibly allege that they were unaware of the factual basis on which to file a petition to enjoin the foreclosure.  To the contrary, the amended complaint contains assertions that, prior to the foreclosure, the Dionnes were aware of their right to file a petition to enjoin and the factual and legal foundation for such a petition, but elected not to file it based on their mistaken belief that the foreclosure sale would not occur.  Under these circumstances, the Dionnes assumed the risk that they would lose the right to challenge the foreclosure.  Thus, RSA 479:25(II)(c) bars their post-foreclosure attempt to void the foreclosure.[14]

Accordingly, Count VIII is dismissed.

---

[14] Because the Dionnes' claim based on RSA 479:25 is barred by their failure to file a petition to enjoin the foreclosure prior to the sale, the court does not address defendants' remaining argument as to that claim.

**Conclusion**

For the foregoing reasons, defendants' motion to dismiss (doc. no. 23) is granted as to Counts VI, VII, and VIII.  The motion is denied as to Counts I, III, IV, and V.  The motion is granted in part and denied in part as to Count II as provided in this order.

The court notes that the Dionnes have filed two motions to compel (doc. nos. 29 & 30).  The court has reviewed both motions.  Several of the discovery requests identified in the motions appear to seek information that is either irrelevant or relevant only to the claim for fraud, which is no longer a part of this case.  Therefore, the motions to compel (doc. nos. 29 & 30) are denied without prejudice.  The Dionnes may refile motions to compel in light of this order, bearing in mind that material related to Counts VI, VII, and VIII is no longer relevant to this case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 14, 2016

cc:  David E. Buckley, Esq.
     Gary Goldberg, Esq.
     Andrea Bopp Stark, Esq.
     Nathan Reed Fennessy, Esq.